FILED

2019 JUN 12  A 9 44

US DISTRICT COURT
BRIDGEPORT CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------x

INTERSTATE BILLING SERVICE, INC.,

                Plaintiff,

    v.

PRECISE     MEDICAL     BILLINGS,    LLC,
ANTHONY    RICCARDI,   AND   PATRICIA
RICCARDI,

                Defendants.

------------------------------------------------x

**COMPLAINT**

No. 3:19 cv 909 (JCH)

Plaintiff Interstate Billing Service ("IBS"), as and for its Complaint herein, alleges as follows:

## Nature of the Action

1.    Pursuant to the financing agreement detailed herein, Defendant Precise Medical Billings, LLC ("PMB") obtained financing from IBS on the basis of fraudulent invoices. PMB's obligations to IBS are secured by liens in PMB's contracts, deposit accounts, and general intangibles, and by the personal guaranty of Defendants Anthony Riccardi and Patricia Riccardi.

2.    IBS brings this action for fraud, breach of contract, breach of guarantee, and injunctive relief.

### A. The Parties

3.    At all material times hereinafter mentioned, Plaintiff Interstate Billing Service Inc. was and is a corporation organized under the laws of the State of Alabama with its principal place of business located in Decatur, Alabama. Plaintiff is in the business of funding accounts receivable and providing other financial accommodations to commercial entities.

4.      Upon information and belief, at all material times hereinafter mentioned, Defendant Precise Medical Billings, LLC is and was a Connecticut limited liability corporation with its principal place of business in Connecticut. Each member of PMB is, upon information and belief, a resident of Connecticut.  PMB is in the business of providing claim administration services.

5.      Upon information and belief, Defendant Anthony Riccardi ("Mr. Riccardi") is an owner and principal of Defendant Precise Medical Billings, LLC, and resides at 73 Lake Wind Road, New Canaan, Connecticut. Mr. Riccardi personally guaranteed the obligations of PMB to IBS.

6.      Upon information and belief, Defendant Patricia Riccardi ("Mrs. Riccardi") is the wife of Defendant Anthony Riccardi, and resides at 73 Lake Wind Road, New Canaan, Connecticut and is an owner, principal, and/or otherwise affiliated with PMB.  Mrs. Riccardi personally guaranteed the obligations of PMB to IBS.

**B.  Jurisdiction and Venue**

7.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants reside in Connecticut.

**C.  The Accounts Receivable Recourse Financing Agreement**

8.      On May 3, 2019, IBS and PMB entered into a Recourse Client Accounts Receivable Financing Agreement ("Financing Agreement").  Exhibit A. Among other things, the Financing Agreement provides that IBS will finance PMB's accounts receivable arising from the sale of goods and services in PMB's ordinary course of business. Exhibit A.

9.      Pursuant to Section 13 of the Financing Agreement, IBS has a security interest in PMB's "Accounts, accounts receivable, contracts, deposit accounts, general intangibles, and Reserve Account, all whether now owned or hereafter acquired, and the proceeds thereof." Exhibit A, § 13.

10.     As an additional inducement for IBS to enter into the Financing Agreement, Mr. and Mrs. Riccardi executed and delivered a guaranty to IBS on or about May 3, 2019 (the "Guaranty").  The Guaranty provides in pertinent part:

> As an inducement for Interstate Billing Service, Inc. ("IBS") to enter into the foregoing Agreement, (WE) Anthony Riccardi and Patricia Ricccardi (collectively, "Guarantor") hereby guarantee the prompt performance and payment by the above-named Client of the obligations under the foregoing Recourse Client Accounts Receivable Financing Agreement.  This is a continuing guaranty and shall not be affect by the termination of the Agreement.   Each Guarantor waives notice of any breach of the foregoing Agreement… in the event Guarantor shall fail to perform or pay his obligations when called upon to do so, Guarantor will pay any and all costs that may be incurred by IBS in enforcing this Guaranty, including reasonable attorneys' fees…
> Exhibit A, p. 20.

11.     Section 11 of the Financing Agreement further provides that PMB indemnify IBS for any loss in connection with the Financing Agreement:

> **11. INDEMNITY.** Client will indemnify and hold harmless IBS … and will reimburse the Indemnified Persons for any loss, liability, claim, damage, expense (including costs of investigation and defense and reasonable attorneys' fees and expenses), or diminution of value, whether or not involving a Customer claim, arising from or in connection with this Agreement or the Accounts.
>
> Exhibit A, § 11.

12.     Additionally, Section 7 of the Financing Agreement provides the following warranties:

> **7. WARRANTIES.** Client warrants that each invoice or document evidencing an Account delivered to IBS arises from a bona fide sale of merchandise or services made in the ordinary course of Client's business, that the amount shown on each invoice or document evidencing an Account is unconditionally due and owing Client from the Customer indicated on the invoices or documents or Account…

**D.  The UCC Filing**

13.     On May 1, 2019, IBS duly perfected its security interest in the accounts receivable, contracts, deposit accounts, and general intangibles of PBS by filing a UCC Statement with the Connecticut Secretary of State. Exhibit C.

**E.  The Fraud and Breach of Contract**

14.     In May 2019, PMB provided IBS with invoices for the following customers: (i) Phoenix Marketing International ("Phoenix"); (ii) Curry Management ("CM"); (iii) Gregg's Garden Center & Landscaping ("GGC"); (vi) Paraco Gas ("PG") and Kingston Oil ("KO"); (v) All About Numbers ("AAN"); and (vii) Integrated Computing ("IC"). In direct violation of the express representations contained in Section 7 of the Financing Agreement, these invoices are fraudulent.

    (a)  **Phoenix** – By email on June 6, 2019, Phoenix informed IBS that it does not have a contract with PMB.  The signature on the contract provided by PMB does not correspond to an employee or representative of Phoenix.

    (b)  **CM** – The contact person provided for CM is an impersonator. On May 21, 2019, the CFO of CM confirmed that the contact person provided by PMB is not employed by CM. The CFO of CM had never heard of PMB.

    (c)  **GCC** – The owner of GCC is Mr. Riccardi's landscaper.  PMB reported that GCC has 143 employees. However, a credit review of GCC revealed that GCC only has two employees. Notwithstanding the fact that GCC only has two employees, PMB submitted an invoice for claims administration services in the amount of $286,577.62.

    (d)  **PG and KO** – As with CM, the contact person provided for KO is an impersonator. IBS contacted KO at the number available for KO on Google; the director of KO expressed confusion at the invoice from PMB, as KO employs another company for its claim administration services.  KO has not denied the invoice, as it recently merged with PG. Defendants used their knowledge of the merger to create false invoices.

    (e)  **AAN and IC** – Like GC, AAN and IC are owned by friends of Mr. Riccardi. The invoices for AAN and IC have been confirmed, but have not been paid, and are highly suspicious to the personal relationship between Mr. Riccardi and those parties.

15.     The invoices delivered to IBS violate Section 7 of the Financing Agreement, which provides that the invoices delivered to IBS are for bona fide sales of merchandise or services. Exhibit A, § 7.

16.     IBS financed PMB's accounts receivable, in reliance on the Warranties set forth in Section 7 of the Financing Agreement by making advances totaling $2,308,883.04, none of which has been paid.  As a result, IBS has suffered $2,308,883.04 in damages.

**F.   The Guaranty**

17.     Although IBS has fulfilled all of its obligations to PMB under the Financing Agreement, PMB has breached its obligations to IBS thereunder and is presently indebted to IBS in the amount of not less than $2,308,883.04.  Pursuant to the Guaranty, Mr. and Mrs. Riccardi are liable to IBS for said amount.

**G.   Irreparable Harm**

18.     Although IBS has a lien upon the accounts receivable, contracts, deposit accounts, and general intangibles comprising its security interest, these assets are easily transferrable. Defendants are likely to transfer, dispose of, or loot these assets.

19.     There are numerous actions pending against Mr. Riccardi in Connecticut state court. *See* Exhibit E.   It is likely that Mr. Riccardi's assets are encumbered, or will be encumbered, by judgments in these actions.

20.     A preliminary injunction is necessary to maintain the status quo in this proceeding and to prevent further irreparable harm to IBS. Absent an immediate order (a) enjoining and restraining the Defendants, and all those acting in combination and concert with them, from transferring assets or impairing the collateral pledged to Plaintiff, or interfering with Plaintiff's efforts to collect accounts receivable pledged to Plaintiff; and (b) directing Defendants to turn

over to Plaintiff all records pertaining to their contract and the accounts receivable pledged to Plaintiff, Plaintiff will suffer an irreparable injury because it will lose the efficacy of the security interests and the ability to ensure satisfaction of any judgment entered against the Defendants in this action.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

### Against PMB

21.     IBS repeats each of the allegations set forth in paragraphs 1 through 20 above as though fully set forth herein.

22.     The parties, for valuable consideration, entered into a valid and enforceable contract on May 3, 2019, in which IBS agreed to finance PMB's accounts receivables arising from the sale of goods and services in PMB's ordinary course of business.

23.     Pursuant to the contract, PMB was required to provide IBS with invoices for the bona fide sale of goods and services in PMB's ordinary course of business.

24.     In breach of the express terms of the parties' contract, PMB delivered fraudulent invoices to IBS.

25.     IBS' breach of contract has damaged IBS in an amount not less than $2,308,883.04, plus interest and attorneys' fees.

## SECOND CAUSE OF ACTION

### (Fraud)

### Against all Defendants

26.     IBS repeats each of the allegations set forth in paragraphs 1 through 25 above as though fully set forth herein.

27.    The Defendants represented and warranted to IBS that the invoices delivered to IBS were for the bona fide sale of goods and services in PMB's ordinary course of business.

28.    IBS reasonably relied on the Defendants' representations and warranties that the invoices were for the bona fide sale of goods and services in PMB's ordinary course of business and IBS advanced $2,308,883.04 in reliance thereon.

29.    IBS' reliance on these representations caused IBS substantial harm in an amount exceeding $2,308,883.04, plus interest and attorneys' fees.

## THIRD CAUSE OF ACTION

### (Guaranty)

### Against Mr. Riccardi

30.    IBS repeats each of the allegations set forth in paragraphs 1 through 29 for breach of guaranty incorporating all allegations above as though fully set forth herein.

31.    Pursuant to the Guaranty delivered by Mr. Riccardi to IBS, Mr. Riccardi guarantied the prompt performance and payment by PMB of the obligations due under the Financing Agreement.

32.    Mr. Riccardi is in breach of and has failed to perform his obligations under the Guaranty by failing to make payment to IBS of the amounts due on the Financing Agreement.

33.    Mr. Riccardi is liable under the guaranty for the $2,308,883.04 million due to IBS under the Financing Agreement, plus interest and attorneys' fees.

## FOURTH CAUSE OF ACTION

### (Guaranty)

### Against Mrs. Riccardi

34.    IBS repeats each of the allegations set forth in paragraphs 1 through 33 for

breach of guaranty incorporating all allegations above as though fully set forth herein.

35.     Pursuant to the Guaranty delivered by Mrs. Riccardi to IBS, Mrs. Riccardi guarantied the prompt performance and payment by PMB of the obligations due under the Financing Agreement.

36.     Mrs. Riccardi is in breach of and has failed to perform her obligations under the Guaranty by failing to make payment to IBS of the amounts due on the Financing Agreement.

37.     Mrs. Riccardi is liable under the guaranty for the $2,308,883.04 million due to IBS under the Financing Agreement, plus interest and attorneys' fees.

### FIFTH CAUSE OF ACTION

#### (Injunction)

#### Against all Defendants

38.     IBS repeats each of the allegations set forth in paragraphs 1 through 37 above as though fully set forth herein.

39.     By reason of the foregoing, IBS is entitled to a permanent injunction (a) enjoining and restraining the Defendants, and all those acting in combination and concert with them, from transferring assets or impairing the collateral pledged to Plaintiff, or interfering with Plaintiff's efforts to collect accounts receivable pledged to Plaintiff, and (b) directing Defendants to turn over to Plaintiff all records pertaining to their contract and the accounts receivable pledged to Plaintiff.

WHEREFORE, IBS respectfully requests that the Court enter judgment in its favor and against the Defendant as follows:

a      on the First Cause of Action against PMB, awarding judgment in favor of IBS for damages in excess of $2,308,883.04, together with interest, costs, and attorneys' fees as provided by the contract;

b      on the Second Cause of Action against all Defendants, awarding IBS damages in an amount not less than $2,308,883.04;

c      on the Third Cause of Action against Mr. Riccardi for breach of guaranty for the $2,308,883.04 million due to IBS under the Financing Agreement, plus interest and attorneys' fees; and

d      on the Fourth Cause of Action against Mrs. Riccardi for breach of guaranty for the $2,308,883.04 million due to IBS under the Financing Agreement, plus interest and attorneys' fees; and

e      on the Fifth Cause of Action, awarding IBS a permanent injunction (a) enjoining and restraining the Defendants, and all those acting in combination and concert with them, from transferring assets or impairing the collateral pledged to Plaintiff, or interfering with Plaintiff's efforts to collect accounts receivable pledged to Plaintiff, and (b) directing Defendants to turn over to Plaintiff all records pertaining to their contract and the accounts receivable pledged to Plaintiff; and

f      for such other relief in favor of IBS which this Court may deem just, equitable and proper, together with the costs and disbursements of this action.

Dated:  June 11, 2019

OTTERBOURG P.C.

By:

Keith A. Costa
William M. Moran

230 Park Avenue
New York, NY 10169-0075
Tel: (212) 661-9100
rhaddad@otterbourg.com
*Attorneys for Interstate Billing Service, Inc.*

## EXHIBIT A

INTERSTATE BILLING SERVICE, INC.
PO Box 2250 / 2114 Veterans Drive SE
Decatur, AL 35609

## RECOURSE CLIENT ACCOUNTS RECEIVABLE FINANCING AGREEMENT

This Recourse Client Accounts Receivable Financing Agreement (this "Agreement") is by and between Interstate Billing Service, Inc. ("IBS") and Precise Medical Billings, LLC ("Client"). Client agrees to begin submitting invoices within 90 days of the date of this Agreement For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, IBS and Client hereby agree as follows:

1. **GENERAL.** Unless sooner terminated pursuant to the terms hereof, Client agrees for a minimum term of one year(s) to finance with IBS certain accounts receivable now existing or hereafter arising from the sales of goods and services by Client in the ordinary course of Client's business ("Account" or "Accounts"). The funding of Accounts will be made on the following terms and conditions, with Accounts to be evidenced by an invoice or document in either paper, electronic, or transmitted list form.

2. **ACCOUNTS TO BE FUNDED.** Each Account shall be funded with recourse against the Client. If any such Account remains unpaid in full or in part at maturity (90 days or before from posting date), Client will, upon demand, pay IBS the full amount of the unpaid balance in addition to the Fee, as outlined in Paragraph 3. IBS will initially fund those Accounts that have been active within the previous twelve (12) months, or that have a balance on the date of this Agreement, and that otherwise meet IBS' standards announced periodically. IBS will make an analysis of such Accounts and will classify each of Client's customers ("Customer") as "BUY" or "no buy". Accounts classified as "BUY" may have a maximum credit limit. IBS will notify Client of the classification and the credit limit. IBS may, in its sole discretion, change the classification and/or credit limit by notifying Client of such change. All fundings of Accounts are contingent on the Customer maintaining its form of business entity and management approved by IBS.

3. **PAYMENT TO CLIENT.** Within 30 days after the execution of this Agreement, IBS will fund Client's current invoices or documents and, if applicable, the outstanding balance of each Customer (the "Transfer Balance"), on the following terms:

As Client is a full recourse client, funding will be 100% of the current invoices or documents or Transfer Balance of Customers, less a discount rate ("Discount Rate") of .75%*/** less the amount to be credited to a reserve account ("Reserve Account") of 9.25% (as more particularly described in Paragraph 6), for a net funding of 90%. The amount to be credited to the Reserve Account will be deducted out of each deposit in advance, with the total reserve requirement maintained at 10.00% of the total outstanding liability of Client (as outlined in this Paragraph 3 and in Paragraph 6). After one year, IBS may update the Discount Rate, with notice to Client.

AGREED: _____

4. **TRANSFER BALANCES.** If any Transfer Balance has not been paid in full by a Customer within 90 days after IBS makes the payment set forth in Paragraph 3, Client will pay IBS the then outstanding amount of each such Transfer Balance, plus the Fee earned and payable to IBS calculated in accordance with Paragraph 3. IBS may hold reserves in the Reserve Account on any Transfer Balance until all Transfer Balances are paid in full.

5. **FUTURE ACCOUNTS.** After the date of this Agreement, Client may request IBS to fund new Accounts (or additional debit entries to existing Customers) arising from the sales of goods or services in the ordinary course of Client's business on the following terms and conditions, in addition to other terms and conditions set forth in this Agreement:

    (a) The sale or other transaction will be evidenced by an invoice or document which should be signed by the Customer or Customer's agent (and any other supporting documentation or paperwork needed for Customer to pay the invoice), and imprinted with Customer's name, address and account number in a form acceptable to IBS and which shall contain the correct address of IBS as the "remit to" address for payment, either stamped or imprinted on the invoice or document;

    (b) Within ten (10) days after each sale, Client will send to IBS all invoices and/or documents plus a summary of the total amount of invoices or documents so delivered. Client also agrees that if a copy was not delivered at the time of funding by IBS, Client will supply IBS any and all copies of invoices or documents requested within 10 days after each sale. Client obligation to supply documents shall continue until all funded invoices have been paid.

    (c) IBS shall have the right to deduct from any payment any amount necessary to cure any shortage in the Reserve Account or to pay any other obligation owed by Client to IBS, including without limitation the Fee due and payable to IBS, as set forth in paragraph 6 below.

    (d) Funds will be deposited by ACH into a deposit account of the Client, for which the Client will provide to IBS account information and/or a copy of a check. The deposit account may change from time to time at the instruction of the Client. Client hereby authorizes such deposits and corresponding debits to the same account. This authorization to credit and debit the deposit account designated from time to time by the Client shall remain in effect until notice is provided by the Client to IBS, and until IBS has a reasonable opportunity to act upon such notice.

INITIAL: _____

(e) Client will submit Accounts to be funded by IBS at a Monthly Minimum Volume as indicated in this Paragraph 5. On the last day of each month, the Discount Rate will be calculated based on at least the Monthly Minimum Volume as set forth below. Any shortage (Discount Rate calculated based on the Monthly Minimum Volume less Discount Rate already collected on Accounts submitted) may be collected from the Reserve Account. Each 90-days, Client volume may be reviewed and, if the agreed minimum is not being met, then the Monthly Minimum Volume and the Discount Rate may be reviewed and adjusted according to the IBS rate chart.

*(MONTHLY MINIMUM VOLUME)*
**$500,000.00**

AGREED: [signature]

**6. RESERVE ACCOUNT.** IBS may, in its reasonable discretion, require Client to establish a Reserve Account in an amount necessary to cover the circumstances causing the requirement but not more than the aggregate outstanding balances of all Customers' Accounts submitted by Client ("Required Amount"). Client shall make additional deposits to the Reserve Account as requested by IBS, and IBS may release amounts from the Reserve Account to Client as the collection experience and other circumstances permit. If Client fails to fund the Reserve Account as requested, IBS may fund the Reserve Account by withholding such amount from payments otherwise due to Client. Client grants IBS a security interest in the Reserve Account to secure any and all obligations of Client to IBS, whether now existing or hereafter arising. IBS may debit the Reserve Account without notice to Client for any such obligation if Client fails to pay such obligation when due. IBS shall have no obligation to pay or account to Client for any interest, profits, or other accruals or income earned or derived from the Reserve Account. The Reserve Account may be reviewed each month and amounts over the Required Amount may be refunded to Client. If Client has more than one (1) entity which does business with IBS, it is agreed that each entity cross-guaranties the other company's (ies' ) obligations and, thus, that IBS may use the reserve of any entity to cover any liabilities which the Client has or which any of the entities have. Concentration on Accounts as outlined in paragraph 3 may be reviewed and the Required Amount adjusted if necessary.

**7. WARRANTIES.** Client warrants that each invoice or document evidencing an Account delivered to IBS arises from a bona fide sale of merchandise or services made in the ordinary course of Client's business, that the amount shown on each invoice or document evidencing an Account is unconditionally due and owing Client from the Customer indicated on the invoices or documents or Account, and that each invoice or document evidencing an Account balance is not subject to any counterclaim, set-off, defense, or other reduction. To the extent that any of the foregoing warranties are false for any reason (including without limitation the reasons below) or in the event any of the statements below are applicable, Client agrees to reimburse IBS on demand, or within 30 days (3 days for (d) and (g) unless previously notified) of demand, any invoices or documents evidencing an Account for which IBS has paid Client:

(a) Goods or services covered by such invoices or documents have been returned or are claimed to have been returned by Customer to Client, or Customer for any reason disputes any aspect of a transaction covered by the invoice(s) or document(s) evidencing an Account;

(b) Customer fails to pay their Account, or any portion thereof, because of any claim or offset asserted by Customer against Client (whether or not such claim is valid or whether or not such claim is related to the Account in issue);

(c) IBS has notified Client prior to delivery of the invoice(s) or document(s) that IBS will no longer fund Accounts of this Customer;

(d) Any invoice or document for which Client notifies Customer to pay Client directly, any money that Client receives from Customer that is not forwarded to IBS within 3 days of Client's receipt, and any short-pay or deduction on invoices paid by Customer;

(e) The Account is owed by a Customer who has failed to pay at maturity or IBS has previously requested that Client reimburse IBS on the Account;

(f) Client has failed to notify IBS that the Customer has changed its management or form of business entity or IBS has not approved such changes;

(g) Client negotiates any checks (payment on Accounts) or other instruments from Customer or deposits any cash payments from Customers to Client. If Client receives such payments, it will immediately remit any such check, instrument, or payment to IBS.

(h) Client is not a U.S. entity;

(i) Any principal or Agent of Client, or Client, is resident in an OFAC-sanctioned country or appears on an OFAC-sanctioned list;

(j) Any Principal or Agent of Client is a citizen from an OFAC-sanctioned country who has not been issued a U.S. Alien registration receipt card (green card);

(k) Client's Customer's primary place of business is in or Accounts arise from an OFAC-sanctioned country; or

(l) Client's Customer appears on an OFAC-sanctioned list.

If Client has failed in any respect to comply with this Agreement, IBS may withhold any funds due Client and deduct, retain, or withhold, such amount from Client's Reserve Account, depository bank accounts or from any other amount due Client to pay any obligations.

INITIAL: [signature]

5/18

8. **CLIENT'S ACCOUNT TO IBS.** Client agrees to pay its own account to IBS according to terms of its statement from IBS. If Client fails to pay any amount to IBS under this paragraph, IBS may collect monies as set forth in Paragraph 7 or may demand immediate payment in full of any deficiencies. . Should any amount due from Client to IBS remain unpaid more than 90 days, Client agrees to pay interest on the unpaid balance at a rate of 1.5% per month or, if less, the maximum interest rate allowed by law. Interest shall accrue until all balances are paid in full.

9. **CUSTOMER PAYMENTS DUE IBS.** Client will direct its Customers to remit Account payments to an address designated by IBS. Client hereby grants IBS a power of attorney to endorse checks on behalf of Client. This power of attorney is irrevocable and coupled with an interest and survives the termination of this Agreement. Client authorizes IBS to notify Customers to make their payments directly to IBS, and Client agrees to cooperate with in any such notification.

10. **CUSTOMER DISPUTES.** Client shall be solely responsible for resolving or adjusting any dispute between Client and Customer respecting the sale of goods or services covered by the Accounts. If, as a result of such adjustment, money is payable to Customer, Client authorizes IBS to pay such amount by crediting Customer's Account and debiting the amounts due to Client hereunder. If Client and Customer are unable to settle their disputes within 30 days, Client will reimburse IBS for the disputed Account.

11. **INDEMNITY.** Client will indemnify and hold harmless IBS, and its officers, directors, employees, successors and assigns (the "Indemnified Persons"), and will reimburse the Indemnified Persons for any loss, liability, claim, damage, expense (including costs of investigation and defense and reasonable attorneys' fees and expenses), or diminution of value, whether or not involving a Customer claim, arising from or in connection with this Agreement or the Accounts.

12. **TERMINATION.** If Client fails to comply with this Agreement in any respect, has failed to pay taxes as they become due or has a tax lien filed against it or its principals, or is involved in any legal process including bankruptcy protection, has ninety (90) days without activity under this Agreement, or does not submit any invoices to IBS within ninety (90) days of the date of this Agreement, IBS may terminate this Agreement immediately. In the case of termination for failure to submit invoices during the first ninety (90) days of the term of this Agreement, Client agrees to pay a termination fee of $0.00 in order to reimburse IBS for its set-up and training expenses. Otherwise, Client, after the expiration of the minimum term of this Agreement as set forth in Paragraph 1 hereof, or IBS, at any time, may terminate this Agreement upon fifteen (15) days prior written notice to the other. If Client terminates this Agreement prior to the expiration of the minimum term of this Agreement, Client agrees to pay to IBS the Discount Rate which would have been earned based on the Monthly Minimum Volume for each of the remaining months until expiration of such minimum term. Termination shall not affect IBS' rights with respect to any transaction which occurred prior to the effective date of such termination. Upon termination, Client agrees upon request to immediately reimburse IBS for the outstanding invoices and satisfy all obligations then owed to IBS. IBS has the option to notify customers of termination. IBS may withhold any funds due Client, and Client will pay all costs that may be incurred by IBS in enforcing this Agreement, including reasonable attorneys' fees.

13. **FINANCING STATEMENT/SECURITY INTEREST/OTHER DOCUMENTS.** Client hereby grants to IBS a security interest in all of its Accounts, accounts receivable, contracts, deposit accounts, general intangibles, and Reserve Account, all whether now owned or hereafter acquired, and the products and proceeds thereof. Client authorizes IBS to file a UCC Financing Statement covering all such collateral. Client designates IBS, or any IBS officers, agents, or employees, its attorney-in-fact for the limited purpose of executing and filing in Client's name a UCC Financing Statement evidencing the security interest granted hereunder. Client agrees to execute and deliver any and all other documents that IBS may reasonably require in connection with this Agreement, as deemed necessary by IBS in its sole discretion. IBS requires and Client agrees to send IBS an annual year-end financial statement within 90-days after its year end, as well as a current financial statement of any guarantor of Client. Client agrees to provide any other financial statements as requested by IBS.

14. **NOTIFICATION OF CLIENT SALE.** Client must give IBS at least thirty (30) days prior written notice of (a) the merger or consolidation of Client (or its successor) with or into a third party, (b) the sale of all or substantially all the assets of Client (or its successor), (c) the sale of a controlling interest in Client to a third party, or (d) a material change in Client's management.

15. **NO ORAL MODIFICATION; ASSIGNMENT.** This Agreement is a complete and final agreement of the parties hereto which may not be modified orally and may not be contradicted by evidence of prior negotiations, prior agreements, course of dealing or usage of trade. Client may not assign this Agreement without the prior written consent of IBS.

16. **NO IMPLIED WAIVER** No failure or delay by IBS to exercise any right or remedy it may have or to require the existence of any condition or to require the performance of any obligation of Client hereunder shall operate as a waiver thereof and such right, remedy, obligation or condition shall remain in full force and effect as if such failure or delay had not occurred.

INITIAL

-5/18

17. **WAIVER OF JURY TRIAL.** NOTWITHSTANDING ANY OTHER PROVISION CONTAINED HEREIN, IN THE EVENT ANY JUDICIAL PROCEEDING IS INSTITUTED IN CONNECTION WITH THIS AGREEMENT, TO THE EXTENT PERMITTED BY LAW, IBS AND CLIENT EACH HEREBY IRREVOCABLY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL WITH RESPECT TO ANY ACTION, CLAIM OR OTHER PROCEEDING ARISING OUT OF OR ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER, OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS.

18. **GOVERNING LAW.** The interpretation and construction of this Agreement, wherever made and executed and wherever to be performed, shall be governed by the internal laws of the State of Alabama.

19. **ELECTRONIC RECORD.** Electronic signatures and an electronic copy of this Agreement shall be deemed as valid and enforceable as the original.

20. **ADDITIONS AND/OR DELETIONS:**
   *Transfer Balance Discount Rate will be .50% with 19.50% reserve
   **An additional 0.04% per day will be charged to the balance of each invoice beginning at day 16

Dated this __3__ day of __May__, 2019.

CLIENT

By: _____

Its: _____Owner_____

INTERSTATE BILLING SERVICE, INC.

By: _____
John Tuck

Its: _____Senior Vice President_____

## GUARANTY

As an inducement for Interstate Billing Service, Inc. ("IBS") to enter the foregoing Agreement, (WE) Anthony Riccardi and Patricia Riccardi (collectively, "Guarantor") hereby guarantee the prompt performance and payment by the above-named Client of all of its obligations under the foregoing Recourse Client Accounts Receivable Financing Agreement. This is a continuing guaranty and shall not be affected by termination of the Agreement. Each Guarantor waives notice of any breach of the foregoing Agreement. IBS may grant Client any extension or indulgence without affecting the liability of any Guarantor. Each Guarantor waives exemptions allowed by the constitution or laws of any state and agrees that, in the event Guarantor shall fail to perform or pay his obligations when called upon to do so, Guarantor will pay any and all costs that may be incurred by IBS in enforcing this Guaranty, including reasonable attorneys' fees. Guarantor also agrees to timely furnish IBS with an annual financial statement dated as of the end of the calendar year or Guarantor's fiscal year, as applicable.

Dated this __3__ day of __May__, 2019.

By: _____
Anthony Riccardi

By _____
Patricia Riccardi

[THIS SECTION IS INTENTIONALY LEFT BLANK]

STATE OF Connecticut
COUNTY OF Fairfield

I, Rosemarie Y Ragette, Notary Public for the State of ___CT___ at Large do hereby certify that Anthony Riccardi, whose name as _owner_ _(office)_ of the Precise Medical Billings _(company)_, a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he/she as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this the 3rd day of May, 2019.

_____
Notary Public

My Commission Expires: 06/30/2022

> ROSEMARIE Y RAGETTE
> Notary Public, State of Connecticut
> My Commission Expires June 30, 2022

STATE OF Connecticut
COUNTY OF Fairfield

I, Rosemarie Y Ragette, Notary Public for the State of ___CT___ at Large do hereby certify that Patricia Riccardi, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he/she executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the 3rd day of May, 2019.

_____
Notary Public

My Commission Expires: 06/30/2022

> ROSEMARIE Y RAGETTE
> Notary Public, State of Connecticut
> My Commission Expires June 30, 2022

5/18

# EXHIBIT C

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| First Corporate Solutions - 888.507.4593 |
| B. E-MAIL CONTACT AT FILER (optional) |
| sprs@ficoso.com |
| C. SEND ACKNOWLEDGMENT TO:  (Name and Address) |

First Corporate Solutions
914 S Street

Sacramento CA. 95811

UCC1-397053                     State of Connecticut

0003304337
5/1/2019

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| OR | Precise Medical Billings, LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| 15 River Rd, Suite 15E | Wilton | CT | 06897 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| OR | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| OR | First Corporate Solutions, as representative | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| 914 S Street / SPRS@FICOSO.COM | Sacramento | CA | 95811 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

Client hereby grants a security interest in all of its accounts (as defined in the Uniform Commercial Code), accounts receivable, contracts, deposit accounts, general intangibles, and Reserve Accounts, all whether now owned or hereafter acquired, and the products and proceeds thereof.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | | ☐ being administered by a Decedent's Personal Representative | |
| --- | --- | --- | --- |
| 6a. Check only if applicable and check only one box: | | 6b. Check only if applicable and check only one box: | |
| ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien   ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer | | ☐ Bailee/Bailor   ☐ Licensee/Licensor | |
| 8. OPTIONAL FILER REFERENCE DATA: | | | |
| [UCC1-397053] | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

# EXHIBIT E



State of Connecticut Judicial Branch

# Superior Court Case Look-up



## Party Name Search Results

Superior Court Case Look-up
  Civil/Family
  Housing
  Small Claims

New Search

Attorney/Firm Juris Number Look-up

Case Look-up
  By Party Name
  By Docket Number
  By Attorney/Firm Juris Number
  By Property Address

Short Calendar Look-up
  By Court Location
  By Attorney/Firm Juris Number
  Motion to Seal or Close
  Calendar Notices

Court Events Look-up
  By Date
  By Docket Number
  By Attorney/Firm Juris Number

Pending Foreclosure Sales

Understanding
Display of Case Information

Contact Us

**Records: 1-6 of 6**

Results for Party Last Name RICCARDI

| Party Name | Case Name | Docket No. | Court Location | Pty No. | Self-Rep. |
|---|---|---|---|---|---|
| RICCARDI ANTHONY | CADOUX, PETER v. VERESPY, ERIN, L. | ☎ FBT-CV-18-5035610-S | Bridgeport JD | D-03 | |
| RICCARDI ANTHONY | WEBSTER BANK, NATIONAL ASSOCIATION v. PAKS HOLDINGS LLC | ☎ FBT-CV-19-6086777-S | Bridgeport JD | D-02 | |
| RICCARDI HEIR AND/OR BENEFICIARY OF LINDA KOCH AKA LINDA J. KOCH ANTHONY | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION v. KOCH, ROBERT | ☎ DBD-CV-18-6027970-S | Danbury JD | D-05 | |
| RICCARDI ANTHONY | CITIZENS BANK, NATIONAL ASSOCIATION v. PAKS HOLDINGS LLC | ☎ HHD-CV-19-5059702-S | Hartford JD | D-02 | |
| RICCARDI ANTHONY | LIBERTY BANK v. PAKS HOLDINGS, LLC | ☎ FST-CV-19-6041425-S | Stamford JD | D-02 | |
| RICCARDI ANTHONY | ION BANK v. PAKS HOLDINGS, LLC | ☎ FST-CV-19-5021685-S | Stamford JD | D-03 | |



Comments

Attorneys | Case Look-up | Courts | Directories | EducationalResources | E-Services | FAQ's | Juror Information | News & Updates | Opinions | Opportunities | Self-Help | Home

Common Legal Terms | Contact Us | Site Map | Website Policies

Copyright © 2019, State of Connecticut Judicial Branch

Page Created on 6/11/2019 at 11:29:45 AM